UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:      CASE NO.: 18-00216-5-JNC
    CHAPTER 11

DUPREE FARMS, LLC
TIN: 26-1563940
1308 Pearidge Road
Angier, NC 27501

         Debtor

EMERGENCY
MOTION FOR USE OF CASH COLLATERAL AND
TO OBTAIN POST-PETITION FINANCING

**COMES NOW** Dupree Farms, LLC ("Debtor"), by and through the undersigned counsel of record and pursuant to §§ 105(a), 363(b) and 364(a) and (c) of the Bankruptcy Code,[1] and moves the Court for authorization to use cash collateral of Regions Bank ("Regions") and Getsco, Inc. ("Getsco") and to obtain post-petition financing from Ag Resource Management/Agrifund, LLC ("ARM"), and Participating Distributor to be named which will be granted super priority first and second liens respectively on 2018 crops and crop insurance upon the terms and conditions memorialized herein. In support hereof, the Debtor shows unto this Court as follows:

**INTRODUCTORY STATEMENT**
Fed. R. Bankr. P. 4001(b)(1)(B)

The Debtor is a limited liability company organized and existing under the laws of the State of North Carolina with its principal place of business in and around Harnett and Johnston Counties. The Debtor is

---

[1] All statutory references, unless otherwise indicated herein, are to the Bankruptcy Code, 11 U.S.C. §101 *et seq.*

1

in the business of farming soybeans, sweet potatoes, tobacco, broccoli, wheat and watermelons. The Debtor's long-term reorganization includes the further diversification of its operation and a voluntary liquidation of equipment if necessary to the reorganization.

The Debtor's revenue comes primarily from the sale of crops as well as the collection of insurance proceeds and federal program payments. If allowed to operate in 2018, the Debtor intends to cultivate a total of 3,098.1 acres, including 431 acres of tobacco, 200 acres of broccoli, 1,415 acres of soybeans, 545 acres of sweet potatoes, 322 acres of wheat and 212 acres of watermelons.

The Debtor anticipates a reorganization through this Chapter 11 proceeding. In order to maintain existing operations, retain maximum value of the business, and maximize return to creditors, the Debtor will be required to incur certain operating expenses, including labor, fuel, hauling, utilities and other expenses associated with planting, cultivating and harvesting its crops. The Debtor's only source of income is through its continued business operations. The Debtor's primary assets consist of its equipment, crops cultivated in 2017 in storage ("Stored Crops"), and 2018 crops currently growing or to be grown.

## JURISDICTION

1.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157 (b)(2).

2.  This Court has authority to hear this matter pursuant to the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984.

3.  The Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code on January 16, 2018 ("Petition Date"), and currently operates as Debtor-in-Possession.

## FACTUAL BACKGROUND

4a. Prior to filing, the Debtor was indebted to Regions by virtue of six cross collateralized loans as follows:

| Description | Principal, Interest and Fees as of January 16, 2018 | Per Diem Interest Thereafter |
|---|---|---|
| Loan No. 413827 (Potato storage - prev. loan ..3864) | $1,127,183.24 | $120.31 |
| Loan No. 414557 (Tobacco baler) | $6,317.09 | $0.65 |
| Loan No. 444760 (Labor camp - prev. loan ...6702) | $54,213.24 | $6.42 |
| Loan No. 514612 (12 Tobacco barns) | $192,011.60 | $21.62 |
| Loan No. 590679 (Inventory - prev. loan ...0661) | $1,887,869.00 | $245.48 |
| Loan No. 659169 (Operating LOC - prev. loan ...9151) | $2,397,103.35 | $303.08 |

4b.    Prior to the filing, the Debtor was indebted to Getsco, Inc. on a credit line secured by a blanket lien on all assets of the Debtor (junior to Regions) in the approximate amount of $450,000.00 perfected by UCC filed July 27, 2017, File No. 20170077838E.  Upon information and belief, there is no excess equity in cash collateral available to Getsco.

5.    It appears that the proceeds to be realized from the sale of the Stored Crops (as defined hereinafter) may constitute the cash collateral of Regions within the meaning of § 363.  Upon information and belief, no other person or entity has or claims an interest in the cash collateral sought to be used, except the second lien position of Getsco for which no cash collateral value remains.

### REQUEST FOR RELIEF

6.    The Debtor requests entry of orders authorizing it to (a) use the cash collateral of Regions in the amount of $319,000.00 ($187,000.00 land rent; $100,000.00 2017 crop insurance premium; and $32,000.00 current payroll) and (b) obtain post-petition agricultural financing from ARM and Participating Distributor in the total commitment amount of $4,386,321.25 (the "Post-Petition Loan").  (ARM has agreed

3

to immediately reimburse Regions for advancing the $32,000.00 of current payroll upon Court approval of the Post-Petition Loan.)  The amount of each provider's portion of the commitment is as follows:

- ARM:  $3,664.865.90
- Participating Distributor:  $721,455.35

7. The dual party credit arrangement with ARM and Participating Distributor is part of a package, the components of which are mutually dependent.  In addition, the package is dependent upon the use of Regions' cash collateral as requested herein in the amount of $319,000.00 for the purpose of 2018 crop production.

8. The package transaction with ARM, Participating Distributor and Regions is referred to hereafter as the "Post-Petition Transaction".

9. Currently, and under the circumstances, the Debtor does not have sufficient funds with which to conduct its farming operations for the 2018 crop year.  2018 land rent totaling $187,000.00; $100,000.00 2017 crop insurance premium; and current payroll of $32,000.00 must be paid immediately.  The Debtor's only source of income is through its continued business operations and, absent the Post-Petition Transaction, it will not be able to conduct its farming operations for the upcoming crop year, thereby reducing the amount available for payment of its creditors in reorganization under the Bankruptcy Code.

10. Copy of the proposed credit agreements with ARM and Participating Distributor will be produced and available at preliminary hearing on Debtor's Emergency Motion for Use of Cash Collateral and to Obtain Post-Petition Financing.

11. If authorized, the Post-Petition Transaction will provide the Debtor with adequate capital to conduct its farming operations for the 2018 crop year.

12. Sections 363 and 364 of the Bankruptcy Code, collectively, authorize Debtors-in-Possession who are authorized to operate the business of the debtor under §1108 to use cash collateral and to obtain unsecured and secured post-petition credit.  Section 363(b)(1) provides that "[t]he trustee, afer notice and

a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The use, sale or lease of property of the estate, other than in the ordinary course of business, is authorized when there is a "sound business purpose" that justifies such action. *See Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 780 F.2d 1223, 1225-26 (5th Cir. 1986); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval under § 363(b) requires a showing that the proposed action is fair and equitable, in good faith and supported by a good business reason).

13.     The business judgment rule is a "policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges". *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.20 (11th Cir. 1989); *see F.D.I.C. v. Castetter*, 184 F.3d 1040, 1044 (9th Cir. 1999) ("The general purpose of the business judgment rule is to afford directors broad discretion in making corporate decisions and to allow these decisions to be made without judicial second-guessing in hindsight.") Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct". *See Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Where a valid business justification exists, the debtor's decision to use property out of the ordinary course of business enjoys a strong presumption that "in making a business decision the . . . corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company". *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

## USE OF CASH COLLATERAL

14.     Section 363 (c) provides that the Debtor may use cash collateral provided "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the terms of Section 363. The term "cash collateral" for purposes

of Section 363 includes "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest . . . " 11 U.S.C. § 363(a).

15. The Debtor represents that a reorganization and continuation of its farming operations will generate the greatest source of funds for the benefit of its creditors.

16. Debtor currently has on hand the following harvested crops ("Stored Crops"). Amount and prices are approximate:

* 30,000 bu. soybeans @ $9.50/bu.: $285,000.00

* 304,000 bu. sweet potatoes @ $5.00/bu.: $1,520,000.00

* **Total approximate value: $1,805,000.00**

17. Upon information and belief, the proceeds of the Stored Crops constitute Regions' cash collateral which the Debtor proposes to use.

18. If the use of cash collateral is not immediately approved, the estate will suffer immediate and irreparable harm, as it will not be able to plant, cultivate and harvest 2018 crops and the Debtor will be forced to cease operations, resulting in a liquidation of its assets.

19. Debtor proposes the following conditions in order to provide adequate protection of Regions' interest in the cash collateral sought to be used in the amount of $319,000.00.

    a. Continuing replacement lien on post-petition crops, proceeds thereof, crop insurance proceeds, and government program payments, subject to the post-petition production money security interest in favor of ARM and Participating Distributor. The validity, enforceability, and perfection of Regions post-petition replacement lien shall be immediately deemed perfected without the need for any further action on Regions' part.

    b. The Debtor will segregate and account separately for the cash collateral in its possession, custody or control.

      c.      The cash collateral used will bear interest at the rate of 4.0% from the time advanced until repaid.

      d.      The Debtor believes that monthly adequate protection payments to Regions may not be required given the equity cushion that Regions has in its cross collateralized collateral plus guarantees and secured debt on real property of the individual officers which has significant equity. Regions will be further provided adequate protection and security with a third lien position on 2018 crops and crop insurance. To the extent adequate protection payments are directed to be made by the Court, the same shall be determined at hearing.

## POST-PETITION FINANCING

20. Section 364(a) allows the Trustee or debtor-in-possession to incur unsecured debt in the ordinary course of business as an administrative expense under Section 503(b)(1).

21. Section 364(b) allows the Trustee or debtor-in-possession to incur unsecured debt outside the ordinary course of business as an administrative expense under Section 503(b)(1) with court approval.

22. 11 U.S.C. § 364(c) provides, in pertinent part, as follows:

(c)    If the Trustee [or debtor-in-possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt

    (1) with priority over any and all administrative expenses of the kind specified in Section 503(b) and 507(b) of this title;

    (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

    (3) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

23. ARM's credit extension ("ARM Loan") is proposed to be secured by a first-priority lien on the Debtor's 2018 crops, including any and all proceeds, products and offspring therefrom ("2018 Crops"), an assignment of the Debtor's 2018 crop insurance, and an assignment of the Debtor's interests, if any, in

2018 farm program payments (together, the "2018 Crop Lien"), and personal guaranties by the Debtor's principals -- Roger H. Dupree and Nicholas H. Dupree.  Pursuant to Section 552(a), these assets are not otherwise subject to a lien and a security interest in favor of ARM is allowed under Section 364(c)(2).  The ARM loan will bear interest at the rate of 10% plus a 3% loan origination and servicing fee.

24. Participating Distributor's credit extension ("Participating Distributor's LOC") will bear interest at the rate of 10%.

26. In accordance with §364(c), a debtor seeking to incur secured debt must make a reasonable effort to seek other sources of unsecured debt, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source.  *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).  However, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (recognizing that where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D.Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (recognizing that secured credit under §364(c)(2) may be authorized, after notice and a hearing, upon showing that unsecured credit unobtainable).

27. Upon information and belief, the Debtor found out for the first time from Regions on or about December 18, 2017 that Regions would not be interested in financing their 2018 operating loan. Regions gave the Debtor a period of two weeks to line up the 2018 operating loan which two weeks included the Christmas Holidays.  The Debtor made preliminary calls to Rabo and Select Bank, but these lenders were

not in a position to do a quick turnaround on crop loan financing, especially during the holidays. Further, the Debtor believes, given the circumstances of this case, that it could not obtain the required funds on an unsecured basis allowable as an administrative expense under § 503(b)(1) or otherwise.

28. The Debtor also believes that the terms offered by ARM and Participating Distributor are similar to other lenders who provide post-petition financing to farming operations in pending bankruptcy proceedings under Chapters 11 or 12 of the Bankruptcy Code.

29. Given that the circumstances of this case require that the Debtor obtain post-petition financing under § 364(b) and (c), the Post-Petition Transaction reflects the exercise of its sound business judgment. The Debtor's business judgment is consistent with the provisions of, and policies underlying, the Bankruptcy Code. In such instances, courts grant debtors considerable deference in exercising its sound business judgment. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under Section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). *See also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981). Here, the Debtor has determined that financing is available only under a combination of §§ 363 and 364(b) and (c) and that entering into the Post-Petition Transaction is in the best interests of the Debtor and its estate.

30. The Debtor negotiated with ARM and Participating Distributor at arms-length, in good faith, and pursuant to its sound business judgment. The terms and conditions of the Post-Petition Loan Documents, to be presented at preliminary hearing, are fair and reasonable under the circumstances.

31. In the instant case, and based upon the foregoing circumstances, approval of the Posts-Petition Transaction is warranted as it will provide the Debtor with immediate and ongoing access to funds necessary to continue its farming operations and pay those expenses that are necessary for the 2018 crop year. Unless the Post-Petition Transaction is approved, the Debtor will be forced to cease its farming operations, which will likely result in irreparable harm to its business and substantial deterioration of the value of its enterprise to the detriment of the bankruptcy estate and the Debtor's employees, customers, creditors, stakeholders, and other parties in interest.

32. Federal Rule of Bankruptcy Procedure 4001(c) provides that a final hearing on a motion to obtain credit may not be commenced earlier than fourteen (14) days after the service of such motion. However, upon request the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. In accordance with Fed. R. Bankr. P. 4001(c), the Debtor requests that the Court (a) conduct an expedited preliminary hearing on the Motion and authorize the Debtor to use Regions' cash collateral and execute any and all documentation to consummate the Post-Petition Transaction and incur debt up to $4,386,321.25 to (i) maintain and finance the ongoing operations of the Debtor, and (ii) avoid immediate and irreparable harm and prejudice to the Debtor's estate and all parties-in-interest, and (b) schedule a final hearing on the relief requested herein.

33. The Debtor's ability to enter into the Post-Petition Transaction is critical to the success of its reorganization under Chapter 11 of the Bankruptcy Code and the ability to preserve any value for its creditors. Without immediate liquidity provided by access to Regions' cash collateral and the Post-Petition Loan with ARM and Participating Distributor, the Debtor will be unable to conduct normal business operations, and its estate, creditors, employees, and equity holders will be immediately and irreparably harmed.

**WHEREFORE**, the Debtor prays the Court as follows:

1. For a preliminary hearing on this Motion in order to avoid immediate harm to the Estate;

2. For an Order authorizing the Debtor to use Regions' cash collateral in accordance with 11 U.S.C. § 363;

3. For an Order authorizing the Debtor to incur post-petition debt and to grant security interests therefore in accordance with 11 U.S.C. §§ 364 and 552(a);

4. That the Court's Order become effective immediately upon its entry and be valid and binding on all parties in interest as immediate liquidity is imperative to preserve ongoing operations; and

5. That the Court allow such other and further relief as it deems just and proper.

Respectfully submitted this the 26th day of January, 2018.

RICHARD D. SPARKMAN & ASSOCIATES, P. A.

BY:  */s/ Richard D. Sparkman*
Richard D. Sparkman
Attorney for Dupree Farms, LLC
NC State Bar No. 6857
Post Office Box 1687
Angier, North Carolina 27501
Telephone: (919) 639-6181
Facsimile: (919) 639-6814
E-Mail: rds@sparkmanlaw.com

## Projected Income

| Source | Acres | Yield | Price | Crop Value | Bk Adj | Rbt Adj | Prod Share | Income |
|---|---|---|---|---|---|---|---|---|
| Soybeans | 1,440.55 | 24.7 | $9.7500 | $346,452 | - | - | 100.0% | $346,452 |
| Wheat | 312.84 | 49.0 | $4.8900 | $74,960 | - | - | 100.0% | $74,960 |
| Tobacco | 437.00 | 2,345.0 | $1.8600 | $1,906,063 | - | - | 100.0% | $1,906,063 |
| Watermelon | 212.50 | 40,000.0 | $0.1200 | $1,020,000 | - | - | 100.0% | $1,020,000 |
| Sweet Potatoes | 534.50 | 447.0 | $5.2500 | $1,254,338 | - | - | 100.0% | $1,254,338 |
| **Broccoli** | 200.50 | 300.0 | $11.0000 | $661,650 | - | - | 100.0% | $661,650 |
| Crop Income | 3,137.89 | | | $5,263,463 | | | | $5,263,463 |
| Total Income | | | | | | | | $5,263,463 |

EXHIBIT A

## Budgeted Use of Funds

| | ARM | Other | 3rd Party | Total |
|---|---|---|---|---|
| Fertilizer | - | $363,697 | - | $363,697 |
| Seed | $356,899 | $96,517 | - | $453,411 |
| Fungicide | - | $161,277 | - | $161,277 |
| Herbicide | - | $211,174 | - | $211,174 |
| Insecticide | - | $51,531 | - | $51,531 |
| Fuel | $227,953 | - | - | $227,953 |
| Labor | $657,976 | - | - | $657,976 |
| Repairs | $78,447 | - | - | $78,447 |
| Insurance | - | - | $45,905 | $45,905 |
| Harvesting | $794,314 | - | - | $794,314 |
| Misc | $151,150 | - | - | $151,150 |
| Cash Rent | $273,928 | - | - | $273,928 |
| Insurance | - | - | $67,399 | $67,399 |
| Living | $263,000 | - | - | $263,000 |
| Living | $62,500 | - | - | $62,500 |
| Tax | $44,000 | - | - | $44,000 |
| Property/Casualty Insurance | $118,000 | - | - | $118,000 |
| Fees and Other | $117,371 | - | - | $117,371 |
| Total Expenses | $3,145,537 | $884,195 | $113,304 | $4,143,036 |
| Estimated Interest | $186,668 | $54,505 | - | $241,173 |
| Cash Flow | | | | $879,254 |

EXHIBIT A

## ➤ Yield History

| | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 3yr Avg | 6yr Avg |
|---|---|---|---|---|---|---|---|---|
| Soybeans | 26 | 25 | 23 | 16 | 28 | 24 | 25 | 24 |
| Wheat | 49 | 37 | 52 | 48 | 52 | 56 | 46 | 49 |
| Tobacco | 2,625 | 1,694 | 2,716 | 2,516 | 1,470 | 2,215 | 2,345 | 2,206 |
| Watermelon | 40,000 | - | - | - | - | - | 40,000 | 40,000 |
| Sweet Potatoes | 491 | 350 | 500 | 425 | 375 | 450 | 447 | 432 |
| **Broccoli** | 300 | - | - | - | - | - | 300 | 300 |